# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

RANDALL A. RADUNZ,

        Plaintiff,

        -vs-                    Case No.   07-C-270

BRUCE VON HADEN,

        Defendant.

## DECISION AND ORDER

        The plaintiff, Randall A. Radunz, currently incarcerated at Minnesota Correctional Facility-Moose Lake, in Moose Lake, Minnesota, is proceeding *pro se* on a civil rights claim pursuant to 42 U.S.C. § 1983, alleging that the defendant violated his Fourth Amendment rights by having Ryan Gemoll retrieve two guns from the plaintiff's barn.  This matter is before the court on the defendant's motion for summary judgment, and three related motions by the plaintiff.

## I.  STANDARD FOR SUMMARY JUDGMENT

        Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D.

Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material facts; and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Id.* at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleadings; rather its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## II. BACKGROUND

On May 25, 2007, the plaintiff, Randall Arthur Radunz, a Minnesota state prisoner, filed this civil rights action under 42 U.S.C. § 1983, along with a petition for leave

to proceed *in forma pauperis*.  Upon screening the complaint pursuant to 28 U.S.C. § 1915A, United States District Judge John C. Shabaz dismissed the complaint on June 19, 2007, on the grounds that it failed to allege state action.  Noting that the state-action element is met when a government official induces a private party to act, the Court of Appeals vacated the dismissal as to defendants Bruce Von Haden and Ryan Gemoll, and remanded the case to the district court for further proceedings.  *Radunz v. Von Haden*, 286 Fed. Appx. 314, 316(7th Cir. June 19, 2008).  This court agreed to preside over the action, as Judge Shabaz was on medical leave.  On January 13, 2009, this court granted the plaintiff's motion to dismiss defendant Gemoll, who is deceased.  Bruce Von Haden is the sole remaining defendant, and the plaintiff is proceeding on a claim that Von Haden violated his Fourth Amendment rights by having Gemoll retrieve two guns from the plaintiff's barn.

### III.  FACTS

The plaintiff, Randall Arthur Radunz, is currently serving a Minnesota sentence for manslaughter.  Defendant Bruce Von Haden was employed as an Investigator with the Pierce County Sheriff's Department at all relevant times, and investigated the death of Tanya Cusinato.  The plaintiff, along with Ryan Gemoll and another man, brought Cusinato to a Minnesota hospital on May 10, 2003, because she had apparently overdosed on drugs.  Cusinato died the next day, and a preliminary autopsy revealed that she had multiple contusions, abrasions, and hemorrhages as well as a fractured hyoid bone in her neck.

3

The defendant obtained a search warrant for the plaintiff's farm in Pierce County, Wisconsin, due to information that drug activity and a violent struggle with Cusinato had occurred there.  Members of the Pierce County Sheriff's Department executed the search warrant on May 15, 2003, and recovered ammunition, drugs, and drug paraphernalia from the plaintiff's premises, which included a farmhouse and a large barn with an adjoining office room.  The plaintiff was arrested for a probation warrant the same day.

On May 16, 2003, the defendant asked Gemoll if he knew anything about the plaintiff's firearms.  Gemoll, the plaintiff's farmhand, said that he kept two guns belonging to the plaintiff in a refrigerator in the barn, and used them for target practice.[1]  The defendant

---

[1] Gemoll told the defendant that the guns in the refrigerator belonged to the plaintiff:

| Q | Tell me about Randy's gun. |
|---|---|
| A | Randy's gun? |
| Q | Oh, yeah. |
| A | Yeah, I know about that. |
| Q | Where is it? |
| A | It's in the barn. |
| Q | Where? |
| A | In the refrigerator, where I put it because I wanted to know where they are.  I go target shooting and stuff like that with him. |

(Transcribed Interview, Doc. # 60-10 at 28).  At the plaintiff's revocation hearing, however, Gemoll testified that he never told the defendant that the guns belonged to the plaintiff:

| Q | What did you tell Investigator Von Haden about the guns at the residence? |
|---|---|
| A | At the residence? |
| Q | Yeah. |
| A | I said I found a couple in the refrigerator, and that they were the friends - - Ronald Dock's, the guy that stayed and helped Randy or whatever, and Randy knew nothing about it, that I target shot them a couple of times when I found them in the refrigerator or whatever, and I took them out target shooting with them, and I put them back where I found them, yeah. |
| Q | Did you tell Investigator Von Haden that the weapons belonged to Mr. Radunz? |
| A | No, I did not.  No. |

4

asked Gemoll to retrieve those guns, which had not been found during the execution of the search warrant.  Gemoll agreed and turned the guns in later the same day.

The defendant believed that Gemoll had joint access to the barn area where he placed the firearms.  Although Gemoll told the defendant that the plaintiff gave him a key to unlock the barn the night Cusinato died, the defendant believed that multiple individuals had access to the barn and used it when the plaintiff was not present.  During the previous day's execution of the search warrant, the plaintiff never told the defendant that the barn was locked or that a key was required.  The defendant knew that Gemoll stayed at the farm and worked there as a farmhand or handyman.  Gemoll told the defendant that he would drink beer in the barn at night and that he kept the guns in  an open, accessible refrigerator in the barn so that he could use them.  Gemoll also agreed without hesitation to bring the guns in.

On July 24, 2003, an administrative law judge held a hearing on the plaintiff's probation revocation and found that he had violated the rules of his probation by allowing his residence to be used as a drug house, and by possessing firearms on the premises.  The Hearings and Appeals Administrator affirmed the decision to revoke the plaintiff's probation, finding that he had admitted possessing and using cocaine and helping to process cocaine into crack, and noting that "the outcome of this case does not rest on the weapons allegation since I believe that revocation is appropriate even in the absence of that allegation."  (Probation Appeal Decision, Doc. # 59 at 12).  The plaintiff completed his revocation sentence on May 1, 2008.

---

(Transcribed Revocation Hearing, Doc. # 59-1 at 81).

On August 1, 2005, the plaintiff pled guilty to Manslaughter 2 Culpable Negligence, and he is currently serving an 88-month sentence in Minnesota.

## IV. ANALYSIS

The defendant maintains that he is entitled to summary judgment for three reasons. First, the defendant argues that the plaintiff's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), because all of the plaintiff's claimed damages relate to his confinement and imply the invalidity of his underlying convictions. Second, the defendant argues that he did not violate the Fourth Amendment, as he reasonably believed that Gemoll possessed joint access to and control over the firearms under the third-party consent doctrine. Finally, the defendant argues that he is protected by qualified immunity because his conduct was not clearly unlawful.

In response, the plaintiff argues his claims are not barred by *Heck* because they would not invalidate the sentence he is serving, as his probation revocation sentence has expired. The plaintiff also contends that the defendant knew that Gemoll did not have keys to enter the barn and that it was therefore unreasonable for the defendant to conclude that Gemoll was authorized to consent to a warrantless search of the barn, or to remove the guns from the barn without the plaintiff's consent. The plaintiff asserts that Gemoll was an at-will employee without any reason to be at the plaintiff's farm while the plaintiff was incarcerated and had not called Gemoll back to work, and that the defendant maliciously sent Gemoll to burglarize the plaintiff's barn, instead of obtaining another warrant to search for and seize the guns.

6

### A. Whether *Heck* Bars the Plaintiff's Claims

In *Heck v. Humphrey*, the Supreme Court ruled that

> [W]hen a state prisoner seeks damages in a § 1983 suit, the
> district court must consider whether a judgment in favor of the
> plaintiff would necessarily imply the invalidity of his conviction
> or sentence; if it would, the complaint must be dismissed unless
> the plaintiff can demonstrate that the conviction or sentence has
> already been invalidated.

512 U.S. at 487.  In a footnote, the Court observed:

> [A] suit for damages attributable to an allegedly unreasonable
> search may lie even if the challenged search produced evidence
> that was introduced in a state criminal trial resulting in the § 1983
> plaintiff's still-outstanding conviction.  Because of doctrines like
> independent source and inevitable discovery, and especially
> harmless error, such a § 1983 action, even if successful, would
> *not* necessarily imply that the plaintiff's conviction was unlawful.

*Id.* at n.7 (internal citations omitted) (emphasis in original).  As the defendant acknowledges,

the Seventh Circuit has interpreted this footnote to imply "a per se exception to *Heck* for all

Fourth Amendment claims." (Defendant's Corrected Brief in Support of Summary Judgment,

Doc. # 61 at 25).  In one such case, the Court of Appeals for the Seventh Circuit noted that

"Fourth Amendment claims for unlawful searches or arrests do not necessarily imply a

conviction is invalid, so in all cases these claims can go forward." *Copus v. City of Edgerton*,

151 F.3d 646, 648 (7th Cir. 1998).

The defendant maintains, however, that allowing all Fourth Amendment claims

to proceed despite convictions that have not been overturned is "inconsistent with later

decisions from the Seventh Circuit" and that "the premise of these cases has been repudiated

7

by the United States Supreme Court."  (Defendant's Corrected Brief in Support of Summary Judgment, Doc. # 61 at 25).  In support, the defendant relies on the analysis in an unpublished Western District of Wisconsin opinion from August of 2005 that favored a fact-specific, rather than categorical, approach in determining whether a particular claim was barred by *Heck*. Notwithstanding this analysis, the Court of Appeals for the Seventh Circuit has continued to hold that "Fourth Amendment claims as a group do not necessarily imply the invalidity of a criminal conviction, and so such claims are not suspended under the *Heck* bar to suit." *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008); *see also Gilbert v. Cook*, 512 F.3d 899, 901 (7th Cir. 2008) ("*Heck* does not affect litigation about police conduct in the investigation of a crime. . . .).  This is true here, where the seized guns were neither a determinative factor in the plaintiff's revocation, nor a legal element of his manslaughter conviction, which involved a victim whose death was related to drug use and strangulation, not gunplay.  A finding that the search was unconstitutional would not imply the invalidity of either the plaintiff's revocation or criminal conviction.

Citing *Gonzalez v. Entress*, 133 F.3d 551 (7th Cir. 1998), the defendant also argues that the plaintiff "has no compensable injury under *Heck*" because his claimed damages all relate to his conviction and imprisonment.  (Defendant's Corrected Brief in Support of Summary Judgment, Doc. # 61 at 32).  In *Heck*, the Supreme Court noted that injuries justifying compensatory damages do "*not* encompass the 'injury' of being convicted and imprisoned," unless the conviction has been overturned.  512 U.S. at 487, n.7 (internal citation

8

omitted) (emphasis in original). A plaintiff may, however, be entitled to other compensatory damages related to a Fourth Amendment violation:

> "[S]ome injury from a violation of the fourth amendment is unrelated to conviction. Suppose the police search a house without probable cause, find cocaine, and throw it away, convicting the defendant on evidence in their possession before the search? Or suppose they search without probable cause, find evidence, and use it at trial on an inevitable-discovery or good-faith theory? The court admits the evidence after finding that the exclusionary rule is not appropriately invoked, and the conviction is proper; but this does not mean that damages are unavailable for the invasion of privacy, the broken door, and so on.

*Gonzalez*, 133 F.3d at 554; *see also Horina v. City of Granite City, Ill.*, 538 F.3d 624, 637 (7th Cir. 2008) (while courts may not award compensatory damages for "the abstract value of a constitutional right," they may award them for injuries such as "humiliation, distress, and other harms associated with the denial of a right"). In addition, both nominal and punitive damages may be awarded, even if compensatory damages are not. *See Horina*, 538 F.3d at 638 ("nominal damages are available to prevailing § 1983 plaintiff when no actual injury is proven") and *Siebert v. Severino*, 256 F.3d 648, 655 (7th Cir. 2001) ("punitive damages are recoverable under Section 1983 even in the absence of actual damages where the jury concludes that the defendant's conduct was motivated by evil intent or involved reckless or callous indifference to the federally-protected rights of others") (internal quotation omitted). Accordingly, while *Heck* prevents the plaintiff from obtaining damages for the injury of a conviction that has not been overturned, it does not bar other compensatory damages for an illegal search, or nominal and punitive damages.

9

**B.  Whether the Defendant Violated the Plaintiff's Fourth Amendment Rights**

**1.  Seizure of the Guns**

Generally, "a seizure of personal property is *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983), *see also United States v. James*, 571 F.3d 707, 713 (7th Cir. 2009).  Furthermore, a "seizure" is defined as "some meaningful interference with an individual's possessory interests in his property."  *Id.*  (quoting *Soldal v. Cook County*, 506 U.S. 56, 61 (1992).  A plaintiff who does not own the seized property lacks standing to bring a § 1983 claim regarding the seizure.  *Siebert*, 256 F.3d at 655 (holding that husband lacked standing to sue for seizure of horses where wife was their sole owner).

In his deposition testimony in this case, the plaintiff explicitly denied ownership of the guns that Gemoll removed from the barn:

> Q    And my understanding is you claim you did not own these guns; is that right?
> A    That's my claim.

(Deposition of Randall Radunz, Doc. # 55 at 15).  Therefore, the plaintiff lacks standing to sue regarding the seizure.  However, it is uncontested that the plaintiff owned the barn where the guns were located, and he therefore has standing to sue regarding the entry into the barn.  *See Siebert*, 256 F.3d at 651-55 (although husband had no ownership interest in seized horses and

10

therefore lacked standing to object to their seizure, he could sue regarding investigator's entry into and search of jointly owned barn where horses were kept).

## 2. Entry/Search of the Barn

In addition to the "property interests" involved in a seizure, the Fourth Amendment's guarantee of the right to be secure against unreasonable searches and seizures also addresses the "privacy concerns" at issue in a search. *James*, 571 F.3d at 713. It is well-established that a "warrantless search violates the Fourth Amendment's protection against unlawful searches and seizures unless an exception to the warrant requirement applies." *United States v. Risner*, 593 F.3d 692 (7th Cir. 2010). One such exception is that, if an individual "allows a third party to exercise actual or apparent authority over [his] property, he is considered to have assumed the risk that the third party might permit access to others, including government agents." *James*, 571 F.3d at 713. "A third party has apparent authority when it would appear to a reasonable person, given the information that law enforcement possessed, that the individual had common authority over the property." *United States v. Crowder*, 588 F.3d 929, 936 (7th Cir. 2009). This authority rests on "mutual use of the property by persons generally having joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974) (quoted in *James*, 571 F.3d at 714).

The Court of Appeals for the Seventh Circuit has "enumerated several factors which, although by no means a complete list, can inform a determination of actual or apparent

authority."  *United States v. Groves*, 530 F.3d 506, 509 (7th Cir. 2008).  These factors

include:

> (1) possession of a key to the premises; (2) a person's admission
> that she lives at the residence in question; (3) possession of a
> driver's license listing the residence as the driver's legal address;
> (4) receiving mail and bills at that residence; (5) keeping clothing
> at the residence; (6) having one's children reside at that address;
> (7) keeping personal belongings such as a diary or a pet at that
> residence; (8) performing household chores at the home; (9)
> being on the lease for the premises and/or paying rent; and (10)
> being allowed into the home when the owner is not present.

*Id.* at 509-10.  Furthermore, courts have cautioned that

> [A]pparent authority cannot exist if there is ambiguity as to the
> asserted authority and the searching officers do not take steps to
> resolve the ambiguity.  "The government cannot establish that its
> agents reasonably relied upon a third party's apparent authority
> if agents, faced with an ambiguous situation, nevertheless proceed
> without making further inquiry.  If the agents do not learn enough,
> if the circumstances make it unclear whether the property about
> to be searched is subject to mutual use by the person giving
> consent, then warrantless entry is unlawful without further
> inquiry."

*United States v. Purcell*, 526 F.3d 953, 963-64 (6th Cir. 2008) (quoting *United States v.*

*Waller*, 426 F.3d 838, 846 (6th Cir. 2005); see also *Illinois v. Rodriguez*, 497 U.S. 177, 188

(1990) ("Even where the invitation is accompanied by an explicit assertion that the person lives

there, the surrounding circumstances could conceivably be such that a reasonable person would

doubt its truth and not act on it without further inquiry.").

In remanding this case for further proceedings, the Court of Appeals observed

that additional facts might establish that Gemoll had actual authority to  consent to the search.

12

286 Fed. Appx. at 317.  In his deposition, however, the plaintiff flatly disputed that Gemoll had joint access or control of the barn:  "It was my place.  Gemoll did not have free reign of that property."  (Deposition of Randall Radunz, Doc. # 55, 118).  Radunz further testified that it was his practice to keep the barn doors "always secured"; he granted Gemoll access to the barn only "[o]n occasion"; that during the occasions when he did give Gemoll access to the barn, he "would have to open the door for [Gemoll] to get in"; and that when he was arrested "the barn was securely locked" and "[n]o one had been given permission to have access" to it. *Id*. at 33-38, 57.

Given this factual dispute, the defendant does not contend that Gemoll had actual authority to consent to a government search of the barn.  Instead, the defendant argues that he relied on Gemoll's apparent authority to consent to the search. The Court of Appeals previously cast some doubt on this theory: "During his interview, Gemoll told Von Haden that he had to get keys from Radunz in order to access the locked barn on the night Cusinato died, which suggests that Gemoll did not have shared access or full authority over the barn." *Radunz* 286 Fed. Appx. at 317.  In his affidavit, the defendant says that when Gemoll mentioned obtaining a key from the plaintiff to unlock the barn, it was unclear whether he was referring to the office inside of the barn or the barn itself.  (Declaration of Bruce Von Haden, Doc. # 60 at 12-13).  However, he failed to "take steps to resolve the ambiguity" despite the caution that "if the circumstances make it unclear whether the property about to be searched

13

is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry." *Purcell*, 526 F.3d at 963-64.

The defendant argues that Gemoll had apparent authority because he lived on the farm. However, it is not clear that the defendant had a reasonable basis for believing that Gemoll resided at the farm, as Gemoll implied that he lived elsewhere with a roommate when the defendant interviewed him on May 16, 2003. (*See* Transcribed Interview, Doc. # 60-10 at 36-37). The defendant's failure to follow up on the ambiguity regarding Gemoll's residence and his need to obtain a key from the plaintiff is particularly noteworthy as the defendant knew that Gemoll was a hired hand, rather than a family member. The defendant cites an unpublished case in which a man who lived with his stepfather on a farm authorized government officials to enter the stepfather's barn. However, while the defendant describes that case as highly analogous to this one, its holding rested largely on the grounds that "mature family members possess the authority to admit police to look about the family residence, since in common experience family members have the run of the house." *Johnson v. Weaver*, 248 Fed. Appx. 694, 698 (6th Cir. 2007) (internal quotation omitted). An employee's authority is usually much more limited than that of a family member, requiring a "fact-specific analysis of the level of responsibility when assessing whether the employee has authority to consent to a search of a residence." *United States v. Ayoub*, 498 F.3d 532, 538 (6th Cir. 2007) (also stating that a daughter's familial role "distinguishes her from mere handymen, landlords, hotel

staff, or former tenants who – though perhaps having keys and limited access to a residence – lack common authority over the residence").

The defendant's failure to clarify Gemoll's authority and control over the barn before asking him to retrieve the guns stored there, is troubling, but the court need not determine whether this failure violated the Fourth Amendment if the defendant is entitled to qualified immunity. *See Chaklos v. Stevens*, 560 F.3d 705, 708 (7th Cir. 2009) ("Without deciding whether this amounts to a constitutional violation, we hold that defendants are entitled to qualified immunity because the law does not make clear that their action was unconstitutional.") (citing *Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808 (2009)).  The defense of sovereign immunity protects from liability police officers "who act in ways they reasonably believe to be lawful." *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987).  A plaintiff may not recover on a Fourth Amendment claim where "'a reasonable officer could have believed [the plaintiff's arrest] to be lawful, in light of clearly established law and the information the [arresting] officer possessed.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting Anderson, 483 U.S. at 641 (1987)).  Qualified immunity provides "ample room for mistaken judgments" and protects "all but the plainly incompetent and those who knowingly violate the law." *Id*. at 229 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986).  After the defense is raised, it is the plaintiff's burden to defeat it by identifying "a clearly analogous case establishing a right to be free from the specific conduct at issue" or by showing that "the conduct is so egregious that no reasonable person could have believed that it would not violate

15

clearly established rights." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001); *see also Mannonia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007).

Employee authority can be factually and legally complex, and "the 'question of when an employee's consent is sufficient for entry into a residence has not been treated uniformly by the courts.'" *United States v. Corral*, 339 F.Supp.2d 781, 791 (W.D. Tex. 2004) (quoting *United States v. Jones*, 335 F.3d 527, 531 (6th Cir. 2003)). In *Corral* and *Jones*, the courts determined that a housekeeper and handyman lacked authority to consent to searches of their employers' homes, but both cases were decided after the events at issue here, and in both cases the employee "was only present at [the employer's] home when [the employee] was there to work." *Corral*, 339 F.Supp.2d 781, 792. Here, the officer knew that Gemoll stayed overnight at the farm at least some of the time and that he used the barn to drink beer at night. Given the lack of clear legal standards for determining third-party consent by an employee, a reasonable officer could have mistakenly believed that Gemoll was authorized to consent to a governmental entry into the barn to search for the guns that Gemoll reported storing there. Some indicia of Gemoll's access to and control of the barn were known to the defendant, such as Gemoll being permitted to drink and listen to music in the barn at night, and Gemoll's reference to either the barn itself or the attached office area as "my" office. Accordingly, the defendant's mistaken judgment regarding Gemoll's authority is protected by qualified immunity.

16

In addition, a governmental search that does not exceed a previous private search usually does not violate the Fourth Amendment at all:

> When the government re-examines materials following a private search, the government may intrude on an individual's privacy expectations without violating the Fourth Amendment, provided the government intrusion goes no further than the private search. *Id*. at 815 ("[T]o be a Fourth Amendment search, a governmental intrusion must infringe on a legitimate expectation of privacy. Because a private search frustrates such an expectation, an ensuing police intrusion that stays within the limits of the private search is not a search for Fourth Amendment purposes.") (citations omitted).

*United States v. Starr*, 553 F.3d 985, 995 (8th Cir. 2008) (quoting *United States v. Miller*, 152 F.3d 813, 815 (8th Cir. 1998)); see also *United States v. Bulgier*, 618 F.2d 472, 478 (7th Cir. 1980) ("The reopening and reinspection of the contents of a container by or in the presence of government authorities following a private search of the same container does not constitute a separate, independent search requiring a warrant.").  This analysis hinges upon a determination of "whether the homeowner or occupant continues to possess a reasonable expectation of privacy after the private search occurs."  *United States v. Paige*, 136 F.3d 1012, 1020 (5th Cir. 1998).  Accordingly, the court must consider

> [W]hether the activities of the home's occupants or the circumstances within the home created a risk of intrusion by the private party that was reasonably foreseeable.  If indeed the private party's intrusion was reasonably foreseeable (based on such activities or circumstances), the occupant will no longer possess a reasonable expectation of privacy in the area or thing searched, and the subsequent police search will not trigger the Fourth Amendment.

*Id*.  Here, Gemoll did not act on behalf of the government until the defendant asked him to retrieve the guns.  Gemoll's previous entries into the barn and use of the guns were private, rather than governmental, and he did not exceed the scope of his previous entries when he retrieved the guns on behalf of the defendant, as he had previously removed them to use for target practice.  Thus, because Gemoll's previous intrusions in the barn were reasonably foreseeable[2], his subsequent retrieval of the guns at the behest of the defendant did not violate the Fourth Amendment.

## OTHER MOTIONS

The plaintiff filed a motion on June 1, 2009, requesting a brief extension of time to respond to the defendant's May 12, 2009, motion for summary judgment.  Ordinarily, the plaintiff's response would have been due within 30 days, or no later than June 11, 2009.  However, the plaintiff's request for a brief extension of time was reasonable under the circumstances, and the court accepts the plaintiff's response brief, filed June 29, 2009, as timely.

Also on June 1, 2009, the plaintiff filed a motion to dismiss the defendant's motion for summary judgment. The plaintiff contends that the defendant's motion for summary judgment cites excerpts from the plaintiff's deposition, and that the defendant therefore violated Rule 5(d) of the Federal Rules of Civil Procedure by failing to file a copy of the

---

[2] In his deposition, the plaintiff acknowledged that Gemoll's work duties included "cleaning and arranging and straightening out the barn" and that "there's a probability that" he found the guns there "while he was organizing and cleaning and going through things."  (Deposition of Randall Radunz, Doc. # 55 at 63-64).

plaintiff's deposition.  However, as the defendant notes, a copy of the plaintiff's deposition was filed on February 12, 2009.  *See* Doc. # 55.

## ORDER

**IT IS THEREFORE ORDERED** that the defendant's motion for summary judgment (Doc. # 56) is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for an order of judgment in his favor (Doc. # 63) is **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for extension of time to respond to the defendant's motion for summary judgment (Doc. # 65) is **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion to dismiss the defendant's motion for summary judgment (Doc. # 66) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 2nd day of March 2010.

**SO ORDERED,**

*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

19